UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

Civil Action No. 12-86-HRW

TIMOTHY WHEELER,                                                    PLAINTIFF,

v.                         **MEMORANDUM OPINION AND ORDER**

UNITED STATES OF AMERICA,                                          DEFENDANT.


This matter is before the Court upon Defendant United States' Motion for Partial

Summary Judgment [Docket No. 33].  The matter has been fully briefed by the parties [Docket

Nos. 33-1, 41 and 44].  For the reasons set forth herein, the Court finds that the Defendant is

entitled to judgment to judgment as a matter of law with regard to the tax periods ending June 30,

2008, September 30, 2008, and December 31, 2008.

## I.

In late 2006, Plaintiff Timothy Wheeler, along with several other individuals

purchased a failing ambulance company, Portsmouth Ambulance Incorporated. [Complaint,

Docket No. 1, ¶¶ 10 and 14].   Plaintiff initially invested $480,000 and owned approximately

20% of its available shares. *Id*. at ¶17.   Plaintiff served as the company's Secretary until August

2007, when he became its President. *Id.* at ¶28.   Pursuant to Section 5.03 of the Portsmouth

Ambulance Regulations, as President, Plaintiff possessed significant authority of the business:

> The president shall be the chief executive officer of the
> Corporation and shall have active executive management of the
> operations of the Corporation, subject, however, to the control of
> the Board of Directors and shall have full authority to execute

> powers of attorney appointing other corporations,
> partnerships or individuals as agents of the Corporation, execute contracts
> on behalf of the Corporation, and shall cause the Corporate Seal of the
> Corporation to be affixed to any instrument requiring it. The President
> shall preside at all meetings of shareholders and discharge all the duties
> that devolve upon a presiding officer, and perform such other duties as
> may be prescribed from time to time by the Board of Directors or the
> Regulations.

[Docket No. 33-11, PAI Regulations].

By the spring of 2008, during Plaintiff's tenure as President, the company was in financial distress. He sought to alleviate the company's cash flow problem by personally loaning it approximately $100,000. [Deposition of Timothy Wheeler, Docket No. 33-35, pg. 35].   Plaintiff persuaded the company's Secretary, Sriharsha Velury, to loan an additional $100,000. [Deposition of Sriharsha Velury, Docket No. 33-38, pg. 48-49].

On October 27, 2008, the Government filed a federal tax lien against Portsmouth Ambulance for the payroll tax periods ending March 31, 2008, and June 30, 2008, in the amount of $356,806.00. [Docket No. 1, ¶ 22].

The record is somewhat unclear as to when Plaintiff became aware that Portsmouth Ambulance had not paid accrued payroll taxes.  Viewing the facts as most favorable to the non-moving party, in this instance, Plaintiff, it is certain that he knew of this failure by the end of 2008. [Docket No. 33-35, pg. 29].  At his deposition, Plaintiff testified that, in his view, he had only two options: (1) "shut the company down, take the revenue and pay the payroll taxes" or (2) "sell the company." *Id.*   He chose the latter. He stated:

> At the point when I was told they had to pay payroll taxes, and
> Medicare is basically not paying the company anymore, you know,
> back then, the decisions were: We have no revenue. How do I

2

preserve 125 jobs and shareholder value? It had nothing to do with payroll taxes.

*Id.* at p. 30.

Having opted to sell the company, he took no meaningful action to ensure tax compliance.   Plaintiff admitted that he declined to use his authority as president to  write checks to cover the past due taxes . *Id.* at 120.   Nor did he follow up with the company's accountant  to make sure employment taxes were being paid. *Id.*

On January 6, 2009, the Government filed a second federal tax lien against Portsmouth Ambulance, this time for the payroll tax periods ending December 31, 2000, and September 30, 2002, and corporate return form 1120 for tax year 2005, in the amount of $222,079.68, all as an "alter ego" of Urgent Care. [Docket No. 1, ¶ 23].  On February 9, 2009, the Government filed a third federal tax lien against Portsmouth Ambulance for taxes  in the amount of $36,382.51 for the tax period ending December 31, 2005. *Id.* at ¶ 24.

Despite its fiscal problems, Portsmouth Ambulance continued to operate until mid-2009. [Docket No. 1 at ¶ 30]. In the first three months of 2009, it paid over $300,000 to its creditors, including $7,000 to Plaintiff, as a partial repayment for his loan . [Docket No. 33-33, pg. 78 and 122].  However, the taxes owing  remained unpaid.

Although Plaintiff testified that he was "consumed" with finding a buyer for the company, however, a sale was never finalized. [Docket No. 33-35, pg. 29].

In April 2009, minority shareholders filed a derivative suit naming Plaintiff as defendant, and alleging that he had breached his fiduciary duties to the shareholders of Portsmouth Ambulance. [Docket No.1, ¶ 26].  Plaintiff formally resigned as Portsmouth Ambulance's

3

president on June 10, 2009. *Id.* at ¶ 28.

As a result of outstanding bank loans that could not be paid, on June 18, 2009, the bank seized Portsmouth Ambulance's remaining assets and sold it for $1 million. *Id*. at ¶¶ 28–31. Ultimately, $636,587.40 went to the IRS. *Id. at* ¶ 32. This was distributed by the IRS as follows: Portsmouth Ambulance's liability for miscellaneous penalty in the amount of $38,420.97; Portsmouth Ambulance's payroll tax liability for March 31, 2008, in the amount of $114,775.19, which constituted a "non-trust fund" payment; Portsmouth Ambulance's payroll tax liability for June 30, 2008, in the amount of $59,805.00 which constituted a "non-trust fund" payment; Portsmouth Ambulance's payroll tax liability for September 30, 2008, in the amount of $49,575.00, which constituted a "non-trust fund" payment; Portsmouth Ambulance's payroll tax liability for December 31, 2008, in the amount of $40,242.00, which constituted a "non-trust fund" payment; Urgent Care's payroll tax liability for December 31, 2000, in the amount of $110,132.04; Urgent Care's payroll tax liability for September 30, 2002, in the amount of $140,144.39; and finally, $83,492.81 for Urgent Care's liability shown on form 1120 for tax year ending 2005. *Id.* In addition to these funds taken from the bank's sale of Portsmouth Ambulance, the IRS issued an assessment against Plaintiff personally in the amount of $451,133.96. *Id.* at ¶ 33. This was the alleged "Trust Fund Portion" of Portsmouth Ambulance's tax liability that remained after the bank's sale of Portsmouth Ambulance, and it related to all four quarters of 2008. *Id.* ¶ 33. The IRS issued an additional assessment against Plaintiff in the amount of $32,505.54 as a trust-fund recovery penalty for the Portsmouth Ambulance employment taxes for the quarterly period ending June 30, 2009. *Id.* at ¶ 54. Thus, the total assessments made against Plaintiff were $483,639.50.

4

Plaintiff filed this civil action seeking an abatement of taxes wrongfully assessed against him in the amount of $483,639.50. Defendant, United States of America filed a counterclaim, alleging that he  is liable for the taxes of Portsmouth Ambulance, Inc. for employment taxes accruing from the four quarterly periods ending June 30, 2008; September 30, 2008; December 31, 2008; and June 30, 2009.

Defendant now seeks judgment as a matter of law as to its counterclaim and Plaintiff's liability pursuant to 26 U.S.C. § 6672.

## II.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The burden to show that there are no genuine issues of material fact falls on the parties seeking summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This Court will consider the evidence in the light most favorable to the non-moving parties, drawing all justifiable inferences in their favor. *Id.* The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail a matter of law. *Id.* at 251–52, 106 S.Ct. 2505.

## III.

The Internal Revenue Code requires employers to withhold taxes from their

5

employees' wages, and to hold such taxes in trust for the United States. 26 U.S.C. §§ 3102,

3402, 7501. These taxes consist of (1) the income taxes that the employer is required to deduct

and withhold from each of its employee's wages. 26 U.S.C. § 3402(a); (2) the amounts withheld

for Social Security and Medicare taxes. 26 U.S.C. §§ 3101, 3102.

Liability attaches under § 6672 only if two requirements are

met: (1) the individual must be a "responsible person" under the statute, and (2) he must have

"willfully" failed to pay over the amount due *Bell v. United States*, 355 F.3d 387, 392-93 (6th

Cir. 2004). A person need possess only be significant (rather than absolute) control over a

company's financial management in order to be considered responsible under § 6672. *Id.*

Accordingly, "[s]ection 6672 does not confine liability for the unpaid taxes only to the single

officer with the greatest or the closest control or authority over corporate affairs." *Gephart v.*

*United States*, 818 F.2d 469, 476 (6th Cir. 1987). Even a corporate officer who was initially

unaware of the unpaid taxes can be held liable if she or he fails to direct all available current and

future unencumbered funds to pay those back taxes. *Huizinga v. United States*, 68 F.3d 139, 145

(6th Cir. 1995).  In this way, "[t]he statute's punitive nature comes not from an increased

monetary penalty . . . but rather from personal, as opposed to corporate, liability." *Bell*, 355 F.3d

at 392-93.

A.      **The Plaintiff was a "responsible person" during at least the last three**
        **quarters of 2008 and the first quarter of 2009.**

Whether one is considered a person "responsible" within the purview of § 6672 focuses

upon the degree of influence and control one has over the financial affairs of the company.

*Kinnie v. United States*, 994 F.2d 279, 283 (6th. Cir. 1993).  Among the factors frequently considered are: (1) the duties of the officer as outlined by the company's by-laws; (2) the ability of the individual to sign checks of the company; (3) the identity of the officers, directors, and shareholders of the company; (4) the identity of the individuals who hired and fired employees; and (5) the identity of the individuals who were in control of the day-to-day financial affairs of the company. *Id.*

Plaintiff admits that he was among the two largest shareholders, possessed and exercised his authority as president, and received thousands of dollars for his services.  As President, he had  broad authority under Portsmouth Ambulance's corporate regulations to: (1) appoint corporate agents; (2) enter contracts on behalf of the company; and (3) call and preside over meetings of the shareholders or directors.

Pursuant to this authority, he helped negotiate contracts to sell Portsmouth Ambulance to MTS and King's Daughters Medical Center.  was deeply involved keeping the company afloat, eventually loaning Portsmouth Ambulance large amounts of his personal funds (and convincing a fellow corporate officer to do the same).

Notably, he was one of only three individuals with signature authority over the company's bank account.  The following colloquy occurred during his deposition:

> Q. So I'm just going to quickly summarize. So you had an authority to sign
> checks on behalf of Portsmouth Ambulance, correct?
> **Dr. Wheeler**: I had the authority, yes.
> Q. And you signed -- and you had the authority to endorse checks
> on behalf of Portsmouth Ambulance, correct?
> **Dr. Wheeler**: I had the authority, yes, but never did.

7

**Q**. And you had authority to take out loans on behalf [of]
Portsmouth Ambulance, correct?
**Dr. Wheeler:** I functioned as president of the company on big
matters, including the financial issues with the banks.
**Q:** Is it your testimony, then, that you were not authorized to sign
any of those loan documents?
**Dr. Wheeler:** No, I am authorized -- I was authorized, yes, sir. . . .
I had authority and exercised that authority.

[Docket No. 33-35, pg. 94-95].

Despite his own testimony to the contrary, Plaintiff insists that his only role in

Portsmouth Ambulance was that of a passive investor.  As for being the President, he urges that

he was so "only on paper." *Id.* at 33.  He states that he was not involved in the day-to-day

operations of the business. *Id.* at pg. 35.   He emphasizes that he had no involvement whatsoever

with the company's payroll. *Id.*

Plaintiff's protests reflect a misunderstanding of the inquiry under § 6672 .  It is his

status, duty and authority that are dispositive; the fact that he did not always actually exercise or

exert his authority does not absolve him of his responsibility to ensure that withholding taxes

were properly paid. *Kinnie*, 994 F.2d at 284.

The facts presented to the Court in *Kinnie* bear remarkable similarity to those before this

Court. Plaintiff William Kinnie formed a corporation with his partner whereby each partner was

a 50% owner. *Id.*  The purpose of the business was to lease and service new and used trucks.

Kinnie served as Vice President and his partner as President.  The corporation began failing to

pay the appropriate payroll withholding taxes in 1985, but continued to pay other creditors.

Kinnie testified he learned of the delinquency in late 1986, but trusted his partner to take care of

the debt. Subsequently, Kinnie directed an accountant to review the corporation's financial

8

records and, in early 1987, Kinnie forced his partner to relinquish any management control of the corporation. *Id.* at 285. Kinnie then established a new corporation identical to the first, essentially subsuming the partners' original corporation. Kinnie took out personal loans to satisfy the debts of the new company, yet still failed to pay the payroll taxes. Kinnie filed an action in the District Court for the Eastern District of Michigan, seeking a refund and tax abatement for the total amount due. *Id.* The District Court granted summary judgment in favor of the United States and found Kinnie liable under §6672. On appeal, Kinnie argued he could not be a "responsible person" because all financial duties were delegated to his partner, and he was merely a passive investor during the time period the payroll taxes accrued. In affirming the District Court's ruling, the Sixth Circuit noted that Kinnie was Vice President and a 50% shareholder, had the authority to sign company checks, had an accountant review the corporate books, and forced his partner to give up management control. The Court noted, "there may be more than one person deemed a 'responsible person' within a corporation. Moreover, one who possesses significant control over the company's financial affairs may not escape liability by delegating the task of paying over the taxes to someone else." Id. The Court further held that although Kinnie "did not always exercise his powers during the quarters at issue," he could not avoid of "responsible person" status. *Id.*

It is clear Kinnie most accurately resolves the issue before this Court. Like Kinnie, Plaintiff owned a large share of the company. Like Kinnie, Plaintiff had a leadership role in the company - that of President during the time period at issue.. Like Kinnie, Plaintiff had the authority to sign company checks and had access to company financial records. Finally, like Kinnie, Plaintiff was actively involved in attempts to revive the company. It is no moment that

Plaintiff, like Kinnie, failed to exercise his clear right to sign company checks, access company financial records, and participate in company financial management.  Like Kinnie, his failure to consistently exercise his authority does not relieve him  of "responsible person" status.

The record establishes that Plaintiff satisfies the first requirement for liability under § 6672.

**B.      Plaintiff acted "willfully" in failing to cure Portsmouth Ambulance's tax delinquencies after December 2008.**

The second requirement under § 6672 is that one willfully fails to collect, truthfully account for, or pay over the employment taxes. One acts willfully within the meaning of the statute by making "a deliberate choice to voluntarily, consciously, and intentionally pay other creditors rather than make tax payments ." *Collins v. United States*, 848 F.2d 740, 742 (6th Cir. 1988).  Once informed, a responsible person's obligation to address a prior tax delinquency is nearly absolute—even where the consequences for the company or individual are dire. See e.g. Bell, 355 F.3d at 396 (responsible person liable for paying over taxes even where doing so would subject the person to civil suit).

Plaintiff first learned of Portsmouth Ambulance's tax delinquency in December of 2008 but admits, however, that after this date he deliberately avoided paying off the company's past and current tax liabilities. He testified that his primary concern was not meeting his company's employment tax obligations, but "preserving shareholder value." [Docket No. 33-35. Pg. 30]. During his deposition, he comes very close to admitting that he could have taken action to address the company's tax deficiencies, but chose not to:

Q. But earlier you testified that you had authority to be able to

[sign corporate checks]?

A. Yes. I had authority, yes.

Q. And you didn't use that authority to pay the taxes, correct?

A. Correct. I -- we decided at that point that the company needed to keep going to pay payroll and—so [a] sale can happen. **If you shut it down, then that is the least—that was the least favorable option. The favorable option was to keep the company going until we sold the company. So was there a month that payroll taxes didn't get paid that I could have paid? Maybe.** But beyond that, I had no control to do anything.

Q. . . .Once you realized that the taxes weren't being paid, did you take any steps to monitor what payments were being made in order to ensure the taxes were being paid?

A. No. Again, I made the statement to Mike Robinson: If they don't pay the payroll taxes, my vote is to shut it down.

Q. Did you follow up with Mike Robinson to make sure the taxes were being paid?

A. No, I did not.

Q. Did you follow up with Kenny Boggs to make sure that the taxes were being paid?

A. No, I did not. Not that I remember.

*Id.* at 120-122.

Indeed, rather than fulfill the tax obligations, the company paid over $300,000 to creditors in early 2009. Given this record, Plaintiff cannot establish a genuine dispute as to the fact that he voluntarily, consciously, and intentionally preferred other creditors (including himself) over the United States. Nor can he escape liability by contending that Portsmouth Ambulance would have gone out of business, or that he might have been sued, if he had stopped paying the company's creditors in order to satisfy the company's tax delinquencies. *See Bell*, 355 F.3d at 396-97.

## IV.

The statutory scheme of §6672, and the caselaw interpreting it, focus on objective

11

factors, rather than subjective factors. In this case, objectively, Plaintiff had the requisite responsibility and the requisite knowledge of the tax delinquency and yet failed to rectify it.

Having reviewed the parties' briefs and the attachments thereto, the court concludes that there is no genuine dispute as to the fact that the Plaintiff, Timothy M. Wheeler, was responsible for the collection, truthful accounting of, and payment of the employment taxes of Portsmouth Ambulance during the period between August 28, 2007 and June 12, 2009. There is also no genuine dispute that the Plaintiff willfully refused to pay over Portsmouth Ambulance's available unencumbered funds after he was notified that Portsmouth Ambulance had not fully paid its employment taxes for the quarterly periods ending June 30, 2008, September 30, 2008, and December 31, 2008. Accordingly, the Plaintiff was properly assessed penalties pursuant to 26 U.S.C. § 6672, and the government is entitled to the unpaid balance of those penalties as a matter of law.

Accordingly, **IT IS HEREBY ORDERED** that Defendant United States' Motion for Partial Summary Judgment [Docket No. 33] be **SUSTAINED**.

This is an **INTERLOCUTORY** and **NON- APPEALABLE ORDER**

This _13th_ day of July, 2015.



Signed By:
_Henry R. Wilholt, Jr._
**United States District Judge**